RECORD NO. 20-3511

In The

# United States Court of Appeals

### For The Sixth Circuit

## MELANIE PELCHA,

*Plaintiff – Appellant,*

## v.

## MW BANCORP, INC.; WATCH HILL BANK,

*Defendants – Appellees.*

## ON APPEAL FROM THE UNITED STATES DISTRICT COURT FOR THE SOUTHERN DISTRICT OF OHIO AT CINCINNATI

———————

## BRIEF OF APPELLANT MELANIE PELCHA

———————

**Donald B. Hordes**
RITTER & RANDOLPH, LLC
**1 East Fourth Street, Suite 700**
**Cincinnati, Ohio  45202**
**(513) 744-7735**

**Paul Plotsker**
THE PLOTSKER LAW FIRM, INC.
**6761 Meadow Ridge Lane**
**Cincinnati, Ohio  45237**
**(513) 826-0037**

**Morris E. Fischer**
MORRIS E. FISCHER, LLC
**8720 Georgia Avenue, Suite 210**
**Silver Spring, Maryland  20910**
**(301) 328-7631**

*Counsel for Appellant*          *Counsel for Appellant*          *Counsel for Appellant*

# DISCLOSURE STATEMENT

Pursuant to Rule 25 of the Sixth Circuit Rules of Appellate Procedure,

Plaintiff-Appellant Melanie Pelcha makes the following Disclosures:

A.    Is said party a subsidiary or affiliate of a publicly owned corporation?

   ANSWER: No.

If the answer is YES, list below the identity of the proper parent corporation or affiliate and a relationship between it and the named party.

B.    Is there a publicly owned corporation, not a party to the appeal, that has a financial interest in the outcome?

ANSWER:  No.

If the answer is YES, list the identity of such corporation and the nature of the financial interest.

Respectfully submitted,

/s/ Donald B. Hordes

Date: August 7, 2020    Donald B. Hordes (0014212)
Ritter & Randolph, LLC
1 E. Fourth Street, Suite 700
Cincinnati, OH 45202
Tel: (513) 381-5700
Direct: (513) 744-7735
Fax: (513) 381-0014
dhordes@ritter-randolph.com
*Attorney for Plaintiff-Appellant Melanie Pelcha*

i

Respectfully submitted,

/s/ Paul Plotsker
Paul Plotsker (087475)
6761 Meadow Ridge Lane
Cincinnati, OH 45237
Tel. No. 513-826-0037
paulplotsker@gmail.com
*Co-Counsel for Plaintiff-Appellant Melanie Pelcha*

Respectfully submitted,

/s/ Morris E. Fischer
Morris E. Fischer, Esq.
(DC No. 490369)
8720 Georgia Avenue, Suite 210
Silver Spring, MD, 20910
Tel. No. 301-328-7631
morris@mfischerlaw.com
*Co-Counsel for Plaintiff-Appellant Melanie Pelcha*

# **TABLE OF CONTENTS**

**Page**

DISCLOSURE STATEMENT ...............................................................................i

TABLE OF CONTENTS......................................................................... iii

TABLE OF AUTHORITIES ..............................................................vi

REQUEST FOR ORAL ARGUMENT .................................................x

I.  STATEMENT OF SUBJECT MATTER JURISDICTION AND
    APPELLATE JURISDICTION....................................................1

II.  STATEMENT OF ISSUES PRESENTED FOR REVIEW..........................2

III.  STATEMENT OF THE CASE ......................................................3

IV.  STATEMENT OF THE FACTS ....................................................4

V.  SUMMARY OF ARGUMENT....................................................15

VI.  STANDARD OF REVIEW........................................................18

VII.  ARGUMENT......................................................................19

    A.  THE LOWER COURT SHOULD NOT HAVE GRANTED
        SUMMARY JUDGMENT TO DEFENDANTS AND
        DISMISSED PLAINTIFF'S AGE DISCRIINATION
        COMPLAINT MERELY BECAUSE DEFENDANTS
        SUCCESSFULLY DEMONSTRATED AT THE
        *MCDONNELL DOUGLAS* PRONG THREE STAGE THAT
        THEIR REASON FOR TERMINATING PLAINTIFF WAS
        PLAUSIBLE AND NOT PREXTUAL ...............................19

    B.  NIESEN'S AGEIST STATEMENTS CONSTITUTED
        DIRECT EVIDENCE OF DISCRIMINATION................................25

C. PLAINTIFF MELANIE PELCHA HAS MET HER BURDEN OF ADDUCING SUFFICIENT CIRCUMSTANTIAL, OR INDIRECT, EVIDENCE WHEREBY A JURY COULD CONCLUDE THAT THE REASON PROFFERED BY DEFENDANTS FOR TERMINATING HER WAS A PRETEXT, AND INSTEAD FIND THAT DEFENDANTS TERMINATED HER BECAUSE OF HER AGE ............................31

   1. THE REASON PROFFEREED BY DEFENDANTS HAD NO BASIS IN FACT ......................................................32

   2. ASSUMING, *ARGUENDO*, THAT PLAINTIFF PELCHA DID ENGAGE IN INSUBORDINATION AS ALLEGED, THAT WAS NOT DEFENDANT'S MOTIVATION BEHIND HER TERMINATION. SHE WAS FIRED BECAUSE OF HER AGE .................................38

   3. ASSUMING, *ARGUENDO*, THAT PLAITIFF PELCHA DID ENGAGE IN INSUBORDINATION AS ALLEGED, THAT ALLEGED OFFENSE WAS INSUFFICIENT TO WARRANT PLAINTIFF'S TERMINATION ....................................................................41

      a. Defendants attempted to offer shifting reasons for terminating Plaintiff ........................................................41

      b. Defendants subjected Plaintiff to disparate treatment ..........................................................................44

      c. Defendants' termination of Plaintiff without first affording her progressive discipline was contrary to their well-established personnel policies contained in its Employee Guide ....................................................47

D.    ASSUMING, *ARGUENDO,* THAT THIS COURT FINDS
      THAT PLAINTIFF HAS NOT ADDUCED SUFFICIENT
      DIRECT OR INDIRECT EVIDENCE  WHEREIN A JURY
      COULD CONCLUDE THAT DEFENDANTS TERMINATED
      HER BECAUSE OF HER AGE, THE COURT SHOULD
      REMAND THE CASE BACK TO THE LOWER COURT
      FOR FURTHER CONSIDERATION AND ANALYSIS IN
      LIGHT OF THE U.S. SUPREME COURT'S RECENT
      HOLDING IN *BOSTOCK V. CLAYTON COUNTY*,  140 S. Ct.
      1731 (2020) ......................................................................................50

VIII.  CONCLUSION..............................................................................52

CERTIFICATE OF COMPLIANCE

CERTIFICATE OF FILING AND SERVICE

PLAINTIFF-APPELLANT'S DESIGNATION OF
RELEVANT DISTRICT COURT DOCUMENTS

ATTACHMENT A

## TABLE OF AUTHORITIES

**Page(s)**

### CASES

*Anderson v. Liberty Lobby, Inc.*,
    477 U.S. 242 (1986).........................................................................19

*Ang. v. Procter & Gamble Co.*,
    932 F.2d 540 (1991) .....................................................................26

*Barnes v. City of Cincinnati*,
    401 F.3d 729 (6th Cir. 2005) .......................................................45

*Beshears v. Asbill*,
    930 F.2d 1348 (8th Cir. 1991) .....................................................28

*Bostock v. Clayton County*,
    140 S. Ct. 1731 (2020)...........................................................*passim*

*Carter v. City of Miami*,
    870 F.2d 578 (11th Cir. 1989) .....................................................30

*Conti v. American Axle and Manufacturing, Inc.*,
    326 Fed. Appx. 900 (6th Cir. 2009) .................................17, 26, 40

*Cooley v. Carmike Cinemas, Inc.*,
    25 F.3d 1325 (6th Cir. 1994) ..................................17, 27, 28, 30

*Damon v. Fleming Supermarkets of Fla., Inc.*,
    196 F.3d 1354 (11th Cir. 1999) ...................................................29

*Fullen v. City of Columbus*,
    514 F. App'x 601 (6th Cir. 2013).........................................*passim*

*Gooden v. Knoll, Inc.*,
    803 Fed. App'x 892 (6th Cir. 2020) ............................................44

*Griffith v. City of Des Moines*,
　387 F.3d 733 (8th Cir. 2004) ............................................................25, 26, 28

*Harrison v. Olde Financial*,
　572 N.W. 2d 679 (Mich. Ct. App. 1997)......................................................26

*King v. Hardesty*,
　517 F.3d 1049 (8th Cir. 2008) ....................................................25, 26, 28, 30

*Kratzer v. Rockwell Collins, Inc.*,
　398 F.3d 1040 (8th Cir. 2005) ................................................................25, 26

*Kresnak v. City of Muskegon Heights*,
　956 F. Supp. 1327 (W.D. Mich. 1997)........................................................26

*Lamer v. Metaldyne Co.*,
　240 F. App'x 22 (6th Cir. 2007)....................................................................49

*LaPointe v. United Autoworkers Local 600*,
　8 F.3d 376 (6th Cir. 1993) ...................................................................*passim*

*Louzon v. Ford Motor Co.*,
　718 F.3d 556 (6th Cir. 2013) ........................................................................45

*Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*,
　475 U.S. 574 (1986)......................................................................................18

*McDonnell Douglas Corp. v. Green*,
　411 U.S. 792 (1973)............................................................................ *passim*

*Miles v. South Central Human Resource Agency*,
　946 F.3d 883 (6th Cir. 2020) ...........................................................24, 40, 41

*Price Waterhouse v. Hopkins*,
　490 U.S. 228, 109 S. Ct. 1775, 104 L. Ed. 2d 268 (1989) ...............25, 26, 28

*Raadschelders v. Columbus State Comm. Coll.*,
　377 F. Supp. 844 (S.D. Ohio 2019)...................................... 15-16, 32, 35, 36

*Smith v. Chrysler Corp.*,
    155 F.3d 799 (6th Cir. 1998) ..........................................................44

*Steele v. Edward D. Jones & Co., L.P.*,
    780 F. App'x 313 (6th Cir. 2019) ..................................................48

*Talley v. Bravo Pitino Restaurant, Inc.*,
    61 F.3d 1241 (6th Cir. 1995) ..........................................................27

*Trans World Airlines, Inc. v. Thruston*,
    469 U.S. 111, 105 S. Ct. 613, 83 L. Ed. 2d 523 (1985) ................26

*Valent v. Summers*,
    208 F.3d 216 (6th Cir. 2000) ..........................................................19

*Walton v. Hammons*,
    192 F.3d 590 (6th Cir. 1999) ..........................................................18

*White v. Columbus Metro Hous. Authority*,
    429 F.3d 232 (6th Cir. 2005) ..........................................................48

*Wilson v. B/E Aerospace, Inc.*,
    376 F.3d 1079 (11th Cir. 2004) ......................................................29

## **STATUTES**

28 U.S.C. § 1291 ..................................................................................1

28 U.S.C. § 1331 ..................................................................................1

28 U.S.C. § 1367 ..................................................................................1

29 U.S.C. §§ 621, *et seq*............................................................1, 3, 22

29 U.S.C. § 623(a) ..........................................................................22, 23

42 U.S.C. § 2000e-2(a)(1)..............................................................18, 23

Ohio Rev. Code § 4112.02..................................................................3

## **RULE**

Fed. R. Civ. P. 56(c)...................................................................................18

# REQUEST FOR ORAL ARGUMENT

Pelcha respectfully requests this Court to hold oral argument on her appeal. The recent U.S. Supreme Court decision in *Bostock v. Clayton County*, 140 S. Ct. 1731 (2020) may have significant ramifications in terms of how the *McDonnell-Douglas* burden-shifting paradigm in employment discrimination cases might be altered.  Under *McDonnel Douglas'* Prong Three, the employee, in order to survive summary judgment, shoulders the burden to show that the employer's reason for terminating her was pretextual, thus negating the employer's non-discriminatory reason as *the* official and only "but-for' reason".  However, *Bostock* held that employees need not be faced with the binary choice of establishing a discriminatory mindset as the only alternative to a non-discriminatory mindset. Rather, there might exist more than one possible reason why the employer terminated the employee, and as long as the employee can establish that the discriminatory reason –in this case age –was merely one amongst  them, her case can proceed.  *Bostock* calls into question the continuing viability of Prong Three Under *Bostock*, one can argue that an employee's  inability to disprove her employer's motivation behind her termination  should not be fatal to her case, but rather can co-exist with the discriminatory reason, and the "dueling motivations", so to speak, should be resolved by the jury.   This application of Bostock into routine employment discrimination cases is certainly a subject for oral argument.

x

# I.    STATEMENT OF SUBJECT MATTER JURISDICTION AND APPELLATE JURISDICTION.

Subject to Title 28 U.S.C. Section 1331 and Title 29 U.S.C. Section 621, *et seq*., the District Court below had original jurisdiction over Melanie Pelcha's ("Pelcha's") claim that Defendants-Appellees Watch Hill Bank and MW Bancorp terminated her employment in violation of the Age Discrimination in Employment Act, As Amended (ADEAAA), Title 29 U.S.C. Section 621 *et seq*., as this issue presents federal questions. The District Court further had supplemental jurisdiction pursuant to 28 U.S.C. Sec. 1367 over Plaintiff's claim of age discrimination under Ohio law.

This Court's jurisdiction in these proceedings derives from Title 28 U.S.C. Section 1291. The District Court's granting of Defendants-Appellees' Motions for Summary Judgment constitutes a final order which disposes of all claims with respect to all of the parties.

On May 14, 2020, Pelcha filed in timely fashion her Notice of Appeal (Notice of Appeal, RE 62, Page ID # 1258) appealing the lower court's Order Granting Summary Judgment on all of her claims. (Opinion and Order of District Court RE 60, Page ID # 1208-1256).

## II.    <u>STATEMENT OF ISSUES PRESENTED FOR REVIEW</u>

A.    Did the lower court err when it found that Plaintiff failed to prove through circumstantial evidence that Defendants unlawfully terminated her because of her age, when she could not demonstrate that her age was the only "but-for" reason given for her termination?

B.    Did the lower court err in finding that "direct evidence" of age discrimination excluded ageist statements by Defendants' primary decision-maker which were not directed to Plaintiff, or made reference to Plaintiff?

C.    Did the lower court err in finding that Plaintiff failed to demonstrate, through circumstantial evidence, that Defendants' decision to terminate her was pretextual?

   1.    Did the lower court err in refusing to find that there was a triable issue of fact as to whether Defendants' reason for terminating Plaintiff lacked a basis in fact?

   2.    Did the lower court err in refusing to find that there was a triable issue of fact as to whether Defendants' true reason for terminating Plaintiff was her age, rather than the non-age reason articulated by Defendants?

3.   Did the lower court err in refusing to find that there was a triable issue

of fact as to whether Defendants' reason for terminating Plaintiff was

sufficient to warrant her termination?

## III.   <u>STATEMENT OF THE CASE</u>

On December 11, 2018, Pelcha filed a Second Amended Complaint  and

Jury Demand against Defendants Watch Hill Bank and its holding company MW

Bancorp in the United States District Court for the Southern District of Ohio,

Western Division (Second Amended Complaint, RE 41) claiming that Defendants

terminated her employment on July 12, 2016 due to her age, in violation of the

Americans With Disabilities Act, As Amended (ADEAAA), Title 29 U.S.C.

Section 621, *et seq*., and also in violation of Ohio Revised Code Section 4112.02.

On December 11, 2018, Defendant's Watch Hill Bank and MW Bancorp. filed

their respective Answers to Pelcha's Second Amended Complaint (RE 42 and 43

respectively).

After the completion of discovery, Defendant Watch Hill Bank filed, on

June 28, 2019, a Motion for Summary Judgment (RE 46).  On June 28, 2019,

Defendant MW Bancorp, also filed  a Motion for Summary Judgment.  (RE 47).

After both motions were fully briefed by the parties, District Court Judge Douglas

R. Cole, on April 17, 2020, issued an Order granting Watch Hill Bank's Motion for

Summary Judgment,  and also granted MW Bancorp's Motion for Summary

3

Judgment (RE 60) on the grounds that Pelcha was lawfully fired for reasons having nothing to do with her age.[1]

On May 14, 2020, Pelcha filed in timely fashion a Notice of Appeal appealing the lower court's Order granting summary judgment to both Defendants. (RE 62)

## IV.     <u>STATEMENT OF THE FACTS</u>

Melanie Pelcha began working as a teller for Defendants which at the time was called Mount Washington Savings Bank, in August 2005. (Defendant Watch Hill Bank's Undisputed Statement of Facts No. 1, RE 50, Page ID # 832). Ms. Pelcha had a very successful career with Defendants for over a decade and, as of the beginning of 2016, she was promoted to a position which entailed a certain level of day-to-day supervision of the other tellers (Transcript of Brenda Sonderman Deposition, RE 50-5, Page ID # 903). She reported directly to Janet

---

[1] The lower court granted Defendant MW Bancorp's Motion for Summary Judgment on the issue of its liability towards Pelcha for wrongful termination in violation of the ADEAAA, as well as other independent claims Pelcha had maintained against MW Bancorp in her Complaint which are not germane to this appeal. The lower court, however, regarded as moot Pelcha's claim of liability against MW Bancorp as her joint employer along with Watch Hill bank, and therefore chose not to make a finding as to MW Bancorp's joint employer status. (RE 60, Page ID ## 47-48). Pelcha's appeal in this case is thus taken against MW Bancorp as well as Watch Hill Bank in the event that this Court reverses the lower court's granting summary judgment to both Defendants, and remands the case to the lower court.

Schneider, who was Defendant's Senior Vice President of Deposit Operations.

(Transcript of Deposition of Janet Schneider, RE 50-3, Page ID # 889).

Ms. Pelcha was well-regarded by her peers and supervisors. Her most recent

annual performance evaluation by her then-supervisor Grace Waddle, was solidly

positive. Her ratings of Ms. Pelcha in various categories of performance were a

combination of "Meets" or "Exceeds". (Deposition Exhibit No. 27 filed with

Plaintiff-Appellant's Memorandum Contra, RE 50-8, Page ID # 981). Janet

Schneider was equally positive about Melanie Pelcha, if not more so:

> Melanie Pelcha was the most valuable person on my team.
> Melanie had been with the company for 11 years, was the most
> knowledgeable person on the team, the Bank's customer's most
> favorite employee and had the largest list of job responsibilities on the
> team. When I began working with Melanie, I made her aware of all of
> the regulatory issues (she had not been made privy to past findings)
> and she immediately jumped in. She gave up days off, cancelled
> vacation days, and began working 6 days a week with me (usually
> averaging about 75-80 hours per week.)

(Deposition Exhibit No. 23, filed with Plaintiff-Appellant's Memo Contra, RE 50-
8, Page ID # 978).

For all times material herein, the President and CEO of Defendants has been

Gregory Niesen. (Transcript of Gregory Niesen Deposition, RE 50-2. Page ID #

865). In May of 2016, Mr. Niesen coerced Ms. Schneider into resigning against

her will, no concrete reasons given. (Transcript of Deposition of Janet Schneider,

RE 50-3, Page ID # 890; Transcript of Deposition of Brenda Sonderman, RE 50-5,

Page ID # 906; Transcript of Deposition of Lindsey Crothers, RE 50-6, Page ID #

926.) Ms. Schneider was Appellant's first line supervisor for the few months

Schneider worked at the bank. Transcript of Deposition of Janet Schneider,RE50-

3. Page ID 889, 891).

Ms. Sonderman took over as Ms. Pelcha's direct supervisor. (Transcript of

Brenda Sonderman, RE 50-5, Page ID # 910). With Ms. Schneider gone, Mr.

Niesen started complaining about Melanie Pelcha to Brenda Sonderman.  Without

offering specifics, he said that Ms. Pelcha never should have been promoted, did

not have the requisite skills and dedication, and he wanted to rectify the situation.

(Sonderman Deposition, RE 50-5 Page ID # 907).

There is ample evidence in the record that Niesen made a number of

disparaging comments about older employees. For example, he repeatedly referred

to an older bank teller, Becky Roush, as "too old", having a "limited shelf life" and

having reached or passed her "expiration date." He expressed those exact words to

Janet Schneider, Brenda Sonderman and Lindsay Crothers. (Schneider deposition,

RE 50-3, Page ID # 894; Sonderman deposition, RE 50-5, Page ID # 919; Crothers

deposition, RE 50-6. Page ID # 926)  Niesen instructed Schneider and Sonderman

to reduce Roush's hours until Roush quit her employment. (Schneider deposition,

RE 50-3,  Page ID # 894; Sonderman deposition, RE 50-5, Page ID # 919).

Niesen also repeatedly expressed his desire to hire younger tellers. He

contended they were tech savvy, would attract younger customers and the tellers'

6

parents. (Schneider deposition, RE 50-3, Page ID # 893; at 115-116; Crothers deposition, RE 50-6, Page ID # 926-27).

Sometime around May 19, 2016, Ms. Sonderman promulgated a rule, applicable only to tellers and other bank employers reporting to her, that a request for time off for vacation, sick leave, or even partial day absences for doctor's visits and other personal appointments henceforth must be accompanied by a written request for time off. (Sonderman deposition, RE 50-5 Page ID # 908). Prior to this time, an oral request for time off would suffice. (*Id*. at Page ID # 910).

In late June or early July of 2016, Ms. Pelcha, aware of her minor son's upcoming dental appointment, had already orally sought, and received, Ms. Sonderman's approval for her to take two hours off for the appointment. (*Id.* at Page ID # 909-910). But Ms. Pelcha told Ms. Sonderman that she did not think she should be required to fill out as written request as well, which she viewed as superfluous. (Sonderman deposition, RE 50-5, Page ID # 908, 910)

On July 7, 2016, Pelcha informed Sonderman that she had consulted with Joe Vortkamp, the Defendant's Controller, who referred her to the current employee handbook for guidance as to the bank's company-wide policies regarding the at-issue requirement. (Exhibit 31 filed with Plaintiff-Appellant's Memo Contra, RE 50-8, Page ID # 985). Pelcha reviewed the handbook and

concluded that no bank-wide policy existed consistent with Sonderman's new requirement.  As such, Pelcha told Sonderman that she was not filling out the request because she wasn't required to do so.  (Sonderman deposition, RE 50-5. Page ID # 908). Notwithstanding her comments, Pelcha later ended up filling out the required form and placed it in Sonderman's office. Sonderman admitted in her deposition that Pelcha did turn in the requisite form on July 7, 2016. *Id*., at Page ID # 910).   Furthermore, Sonderman made Greg Niesen aware, *prior* to Pelcha's July 12, 2016, termination, that  Pelcha had turned in the required form (Deposition Exhibit No. 6, filed with Plaintiff-Appellant's Memo Contra, RE 50-8, Page ID # 930).

On Friday, July 8, 2016, there were several events relating to the Defendant's termination of Ms. Pelcha.  First, at a senior management meeting, Mr. Niesen stated that Mr. Vortkamp had shared with him his recent conversation with Ms. Pelcha about her unwillingness to fill out Ms. Sonderman's written request form and his recommendation for her to review the company handbook**.** (Sonderman deposition, RE 50-5, Page ID # 908)  Based on Mr. Vortkamp's input, Mr. Niesen spuriously announced his decision to fire Melanie Pelcha for "insubordination", effective the following Monday, July 11, 2016 (which ended up being July 12, since Ms. Sonderman was on vacation on Monday, July 11). (*Id*., RE 50-5, Page ID # 910-911) Absolutely no other basis was given by Mr. Niesen

8

for his abrupt decision. (*Id*. at 168, 207). However, later in the day, after talking with Watch Hill counsel, Mr. Niesen decided to hold a meeting with Melanie Pelcha to get her side of the story. (Niesen Deposition RE 50-2, Page ID # _, Page ID # 871-872).

That meeting was held on Monday, July 11th and there were several accounts of the meeting. According to Mr. Niesen, he told Ms. Pelcha that he had learned that Ms. Pelcha had refused to fill out the written request form, and that there had been additional allegations of insubordination and "work issues." (*Id.* at Page ID # 873). Mr. Niesen admitted during his deposition that he had no recall of examples he was referring to when he accused her of additional "insubordination" or "work issues," other than the limited input that had been provided at the management meeting the previous Friday. (*Id*. at Page ID # 873, 878, 879). For her part, Ms. Pelcha recalls Mr. Niesen saying nothing negative about her at the July 11 meeting other than raising the written request form issue (Pelcha Deposition, R.50-1, Page ID # 861-863).

Furthermore, Niesen claimed that he closed the July 11th meeting by admonishing Ms. Pelcha to see Ms. Sonderman the very first thing the next morning to try and reconcile their differences and clear up any misunderstanding if she wanted to avoid being fired. (Niesen Deposition, RE 50-2, Page ID # 873), something Ms. Pelcha did not recall (Pelcha Deposition, RE 50-1, Page ID # 863).

Curiously, Niesen never gave Ms. Sonderman advance notice that he had instructed Ms. Pelcha to see her. (Niesen Deposition, RE 50-2,, Page ID # 874).

At 8:26 am on Tuesday, July 12, 2016, Mr. Niesen received a two-page email from Brenda Sonderman (Deposition Exhibit No. 6,  RE 50-8, Page ID # 930).  The lead in paragraph contained a "recommendation" from Ms. Sonderman that Ms. Pelcha be fired:

> Please review my recommendation for the immediate termination of Melanie Pelcha due to insubordination, contributing to a negative work environment and failure to complete assigned task [sic]. Please see the following examples that illustrate a pattern of behavior that is not consistent with expectations of a Watch Hill Bank employee.

Ms. Sonderman then followed up with several examples of Ms. Pelcha's alleged insubordination, negativity and failure to complete assigned tasks.  According to Mr. Niesen, shortly after sending him her email, Ms. Sonderman followed up with a phone call and asked him whether he thought her email was "adequate" (Niesen Deposition, RE. 50-2, Page  ID  # 875).

For her part, Brenda Sonderman vigorously denies Mr. Niesen's version of events.  She flatly denies having willingly "recommended" of her own free will the termination of Ms. Pelcha.  Rather she was *ordered* by Mr. Niesen to put those words in the lead-in paragraph of her July 12 memorandum to him.  Mr. Niesen, and Mr. Niesen only, orchestrated Ms. Pelcha's termination.  As of the beginning of the morning of July 12, he had already decided the day before that Ms. Pelcha

needed to go. (Sonderman Deposition, RE 50-5, Page ID # 972.   Ms. Sonderman steadfastly denied that she wanted Ms. Pelcha to be fired and further denied making the recommendation of her own free will. (*Id*. at Page ID # 911), and that she was ordered against her will by Mr. Niesen to make the recommendation. (*Id*. at Page ID # 915-916).

> "At that point I understood it to be an inevitable outcome, *so I was doing what I was directed to do*".

(*Id*., Page ID  # 1134) (emphasis added).  In fact, Ms. Sonderman testified that Mr. Niesen ordered her to make the recommendation as if it were coming from her. (*Id*., Page ID # 914-915).

Niesen, however, disputed Sonderman's account of the termination recommendation. At deposition he was asked point blank if he would have terminated Pelcha but for Sonderman's recommendation. He squarely testified that had Sonderman not recommended Pelcha's termination, he would have done "nothing." (Niesen deposition, RE 50-2, Page ID # 880).

Later that morning or the early afternoon, Mr. Niesen met with the Bank's Compensation Committee, and informed them that he intended to terminate Pelcha that day. (*Id*. at Page ID # 876-877).  Mr. Niesen testified in his deposition that he proposed Ms. Pelcha's termination to the Compensation Committee solely on the basis of Ms. Sonderman's "recommendation" contained in the lead-in paragraph to her early morning memorandum to him.  (*Id.*; Deposition Exhibit No. 6 to

Plaintiff-Appellant's Memo Contra, RE 50-8, Page ID # 930-931). According to

Mr. Niesen, the impetus to fire Ms. Pelcha came solely from Ms. Sonderman, and

not him. *Had she not recommended Ms. Pelcha's termination, he would have done*

*nothing to effectuate it.*

BY MR. HORDES

**Q. Are you aware, if you know, that Brenda Sonderman has at
some point since July 12th, 2016 stated under oath that it was
never her true recommendation to terminate Melanie Pelcha?**

MS. MILLER: Object to the characterization and the form.

Go ahead.

A. Based on this memo in writing, she recommended the termination
of Melanie Pelcha. And this is the facts that I went on in my actions.

BY MR. HORDES:

**All right. So had she not – what would you have done had she not
recommended the termination of Melanie Pelcha?**

A. *Nothing.*

(Niesen Deposition, R. 50-2, Page ID # 880) (emphasis added).

Later in the afternoon on July 12, 2016, Mr. Niesen convened the exit

meeting with Ms. Sonderman and Ms. Pelcha in attendance. It went very quickly.

According to Ms. Sonderman, Mr. Niesen informed Ms. Pelcha that she was being

fired for her failure to turn in her written request for a couple of hours' time off to

take her son to the dentist (Sonderman deposition, RE 50-5, Page ID # 911, 913).

That was it. No other examples were cited. (*Id.*) Ms. Pelcha's recollection of what Mr. Niesen said at that meeting conforms with Ms. Sonderman's. The only reason cited by Mr. Niesen at the exit interview was her failure to fill out the written request form. (Pelcha deposition, RE 50-1, Page ID # 861. Ms. Sonderman never had a chance to remind Mr. Niesen that Ms. Pelcha had ended up turning in her written request for time off, since she had been told at the beginning of the exit meeting not to say anything. (Sonderman deposition, RE 50-5, Page ID # 913). Ms. Pelcha was terminated effective that day, July 12, 2016.

Defendants have maintained a "Watch Hill Bank Employee Guide," the most recent edition of which was promulgated on January 26, 2016. (Deposition Exhibit No. 8, RE 50-8, Page ID # 934). Pages 6-9 of the Guide include the Bank's "Code of Conduct" which, *inter alia*, sets forth the Bank's expectations how employees should conduct themselves on the job. (*Id.* at Page ID # 939-942). Nothing alleged by Mr. Niesen against Ms. Pelcha remotely approaches conduct which is prohibited by these standards. The Employee Guide also contains a section on "Corrective Action Plans" which states in pertinent part as follows:

> Corrective action will be handled fairly and respectfully. Inappropriate conduct or substandard performance *will be investigated before any corrective action is taken*. To ensure objectivity, fairness and consistency, managers are required to discuss all corrective actions with the Human Resources Department, or a member of senior management, before taking corrective action.

> Corrective action may be formal or informal, depending on the
> seriousness or frequency of the behavior or performance.  If corrective
> action is taken, it will be discussed with you and it may be
> documented in a Corrective Action Plan for improvement.

Corrective action is typically "progressive" and may follow "steps" which include verbal discussions and written warnings. Some performance concerns are serious enough to not follow a progressive schedule.  Watch Hill Bank reserves the right to terminate employment for any reason.

(*Id* at Page ID # 971) (emphasis added).

Neither Mr. Niesen, nor Ms. Sonderman brought up the matter of Ms. Pelcha's termination, or any lesser form of discipline, with the Bank's Human Resources manager Julie Bertsch. Nor was there ever an investigation. The only evidence Mr. Niesen had to go on was what Mr. Vortkamp had told him at the management meeting on July 8, namely that Ms. Pelcha did not want to sign the written time-off request form. Based on that slim reed of information, he barged ahead with his desire to terminate her. Had he investigated the case, he would have discovered that Ms. Pelcha had submitted her written request after all, so, in the end, there was actually no insubordination. Furthermore, Mr. Niesen did not give Ms. Pelcha "progressive discipline" which was called for in the handbook. (Niesen Deposition, RE 50-2, Page ID # 868).

Sometime following Pelcha's termination, Sonderman hired a part-time teller in her forties. (Sonderman deposition, RE 50-5, Page ID # 920).  Upon

learning of the hire, Niesen stated words to the effect of, "That's good. She's older than Melanie, so there shouldn't be an issue there." (*Id*. at Page ID #  920).

In contrast to Pelcha, two other employees, Joe Vortkamp and Becki Firestone, both under forty years old, were not terminated the first time each violated a company policy. (Exhibit 38, filed with Plaintiff-Appellant's Memo Contra, RE 50-8, Page ID # 986).  Instead the company warned each employee that future company violations would result in further disciplinary action. (*Id*.)

At the time of her termination, Melanie Pelcha was 48 years old. (Plaintiff-Appellant's original Complaint filed on July 21, 2017, RE 1, Page ID # 1; EEOC Age Discrimination Charge file by Plaintiff-Appellant, Attachment 1 to RE 1, Page ID # 11)

## V.    <u>**SUMMARY OF ARGUMENT**</u>

The District Court erred when it granted Summary Judgment to the Defendant. The lower Court held that the Appellant did establish a *prima facie* case for discrimination. However, when  it applied the burden-shifting analysis found in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973) it held that the employee didn't establish enough facts in the record to disprove the employer's legitimate reason of Appellant's insubordination, thereby causing her termination. The Court equated Appellant Pelcha with the employees in *Raadschelders v.*

*Columbus State Comm. Coll.*, 377 F. Supp. 844, 858 (S.D. Ohio 2019) and *Fullen*

*v. City of Columbus*, 514 F. App'x 601, 606 (6th Cir. 2013).

However, these cases are not comparable to the case at bar. The aforesaid

precedents pertained to cases in which the employee continued to defy the

employer and never capitulated to the employer's stated rule or policy. In this case,

Pelcha ultimately completed the written form that she had first refused to complete,

provided it to her supervisor and the supervisor and the ultimate decision maker

were aware of same prior to the termination decision. In addition, Pelcha asked the

employer's comptroller whether she was required to follow her first-line

supervisor's rule. He did not advise her that she was required to follow same.

Rather, he directed her to a company handbook that didn't establish the rule.

Consequently, at worst, Pelcha didn't follow a rule, but she never indicated a

refusal to follow a rule. As such, she was not insubordinate.

The lower Court also erred when it did not consider the question of fact with

respect to the actual decision maker who terminated Appellant. Her first line

supervisor, Sonderman, testified that she would not have terminated Appellant but

for the direction of her superior Niesen. He testified to the very opposite; namely,

that Sonderman recommended to him the termination and he wouldn't have

terminated Appellant but for her input. As such, even if in addition to the

insubordination termination reason, there were examples cited by Sonderman of

deficient work performance, nonetheless, the lower Court didn't properly analyze the key question as to whether Sonderman would have terminated Appellant because of those deficiencies. Sonderman testified that she would not have terminated Appellant. Sonderman was the person who instituted the rule regarding the written form.

The District Court also did not properly analyze the direct evidence standard in this Circuit, reflected in a number of cases. *Conti v. American Axle and Manufacturing, Inc.*, 326 Fed. Appx. 900 (6th Cir. 2009), *LaPointe v. United Autoworkers Local 600*, 8 F.3d 376 (6th Cir. 1993) and *Cooley v. Carmike Cinemas, Inc*., 25 F.3d 1325 (6th Cir. 1994) which have a far more liberal application of direct evidence. Most significantly, the ageist comments do not have to necessarily be made to the Plaintiff to qualify for "direct evidence." Under the correct standard, Niesen's comments to an older bank teller, as having a "limited shelf life" and having reached or passed her "expiration date" along with his repeated preference for younger tellers  should have been considered direct evidence. As such, the Court should have denied Summary Judgment.

In addition, there are issues with respect to the Court's decision not to consider the comparators at the McDonald Douglas stage of the analysis. Finally, given the recent Supreme Court opinion in *Bostock v. Clayton Cty*, 140 S. Ct. 1731 (2020), there is a real question as to whether the "but for" standard in ADEA cases

17

is still the law. In *Bostock*, Justice Gorsuch analyzed the Title VII statutory language of "unlawful … for an employer to fail or refuse to hire or to discharge … because of such individual's race, color, religion, sex or national origin." § 2000e-(2)(a)(1). Justice Gorsuch analyzed the term, "because of" with respect to there existing more than one cause. He further analyzed this term in light of the fact that Congress could have qualified that term with the words, "solely" or "primarily because of", but chose otherwise. Hence, the Supreme Court re-established the "mixed motive" standard for Title VII cases using the statutory language in a different way. Consequently, since the ADEA has the same "because of" language without the same qualifying terms of "solely" or "primarily because of' the "but for" standard would appear not to be appropriate for ADEA cases.

## VI.   STANDARD OF REVIEW

Summary judgment may only be granted where the "pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any, show that there is *no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law.*" Fed. R. Civ. P. 56(c) (emphasis added). In ruling upon a motion for summary judgment, the court must "assess the factual evidence and draw all reasonable inferences in favor of the non-moving party." *Walton v. Hammons*, 192 F.3d 590, 592 (6th Cir. 1999); *see also Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).

18

Significantly, when determining whether to award a party's motion for summary judgment, the court may not "...weigh the evidence and determine the truth of the matter," but rather it must simply determine "whether there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986).  A genuine issue for trial is deemed to exist when there is sufficient "evidence on which the jury could *reasonably* find for the plaintiff." *Valent v. Summers*, 208 F.3d 216 (6th Cir. 2000) (*citing Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986) (emphasis added)).

## VII. <u>ARGUMENT</u>

**A.    THE LOWER COURT SHOULD NOT HAVE GRANTED SUMMARY JUDGMENT TO DEFENDANTS AND DISMISSED PLAINTIFF'S AGE DISCRIIINATION COMPLAINT MERELY BECAUSE DEFENDANTS SUCCESSFULLY DEMONSTRATED AT THE *MCDONNELL DOUGLAS* PRONG THREE STAGE THAT THEIR REASON FOR TERMINATING PLAINTIFF WAS PLAUSIBLE AND NOT PREXTUAL.**

The lower court stated at the outset of its Decision the fundamental legal framework for its analysis of this case.

> To prove unlawful treatment under the ADEA, a plaintiff must offer evidence that the employer's action would not have occurred but-for the employee's age. *Blizzard*, 698 F.3d 283 (citing *Gross v. FBL Fin. Servs., Inc.*, 557 U.S. 167, 177 (2009)).  A plaintiff must do more than "show that age was *a* motivating factor in the adverse action [citations omitted]. [R]ather the ADEA's "because of" language requires a

plaintiff "prove by a preponderance of the evidence. that age was *the* "but-for" cause of the challenged employer decision." (quoting *Gross*, 557 U.S. at 177-78).

(Lower Court's Opinion and Order, RE 60, Page ID # 1223) (emphasis added).

There was nothing particular provocative or ground-breaking about the lower court's interpretation of the law. Its decision, handed down on April 17, 2020, applied what was, at that time, well-established Supreme Court and Sixth Circuit law. The Court's view of an employer's motivation for taking adverse action against an employee is binary. It arises *either* out of age-bias, *or* out of something else, either business-related or otherwise. There cannot be *two* "but-for" motivations, only one. And if an ADEA plaintiff is to survive summary judgement, she must show that the employer's age bias is the *one and only* reason she was terminated or otherwise adversely treated. If there exist other reasons which arguably may have motivated the employer's decision to terminate her, other than or in addition to the plaintiff age, she cannot prevail in her suit.

However, all that changed when the U.S. Supreme Court handed down its Decision in *Bostock v. Clayton County*, 140 S. Ct. 1731 (2020). While the issue before the Court in *Bostock* was altogether different than in the case at bar --- discrimination based on sexual orientation rather than age --- the reasoning of the Court has significant ramifications in this case. Writing the 6-3 majority opinion, Justice Neil Gorsuch began his analysis of the case by re-addressing an employee's

burden under Title VII of the Civil Rights Act to establish an employer's

motivation for terminating her. What exactly did Congress mean when it said that

an employer was prohibited from terminating an employee "because of" his or her

sex?  How does an employee establish the "because of"?

Justice Gorsuch began by stating it was a matter of the employee showing a

"but for causation", elaborating:

> That form of causation is established whenever a particular outcome
> would not have happened "but-for" the purported cause. [citing *Gross
> v. FBL Servs., Inc*., 557 U.S. 167, 176.]  In other words, a but-for test
> directs us to change one thing *at a time* and see if the outcome
> changes.  If it does, we have found a but-for cause.

*Bostock* at 1739 (emphasis added).

Judge Gorsuch went further.

> This can be a sweeping standard.  Often events have *multiple causes*. .
> When it comes to Title VII, the adoption of the traditional but-for
> causation standard means a defendant cannot avoid liability just by
> citing some *other* (emphasis supplied) factor that contributed to its
> challenged employment decision.  So long as the plaintiff's sex was
> one *but-for cause* of that decision, that is enough to trigger the law.

*Id.* (emphasis added).

*Bostock*, Plaintiff respectfully submits, represents a significant shift in the

law.  Employers may in fact have multiple motivations for terminating an

employee, an unlawful motivation being but one of them. But an employee can still

prevail if she can prove to a jury that the unlawful motivation (sex, in *Bostock*)

formed the basis for her termination.  The existence of other non-prohibited

motivations behind the employer's termination decision will no longer be grounds for non-suiting the employee.

In reaching this decision, Justice Gorsuch employed a traditional canon of statutory construction.

> No doubt Congress could have taken a more parsimonious approach. As it has in other statutes, it could have added "solely" to indicate that actions taken "because of" the confluence of multiple factors do not violate the law [statutory citation omitted] . . . Or it could have written "primarily because of" to indicate that the prohibited factor had to be the main cause of the defendant's challenged employment decision [statutory citation omitted] . . . But none of this is the law we have.

*Id.*

To be sure, the case *sub judice* is not a Title VII case. Rather it is an age discrimination case brought under the Age Discrimination in Employment Act, as Amended (ADEAAA), 29 U.S.C. Section 621 *et seq.* The ADEA's global prohibition against workplace discrimination based on age appears in 29 U.S.C. 623(a), which reads in pertinent part as follows:

> SEC. 623.

> (a) Employer practices

> It shall be unlawful for an employer-

> (1) to fail or refuse to hire or to discharge any individual or otherwise discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, *because of such individual's age.*

(emphasis added).

Section 623(a)'s "because of" language tracks *verbatim* the pertinent parallel  language found in Title VII of the Civil Rights Act, 42 U.S.C. Section 2000e-(2)(a)(1) which, as Justice Gorsuch noted in *Bostock*, provides that "it is unlawful for. . . an employer to . . . discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, *because of* such individual's race, color, religion, sex, or national origin." (emphasis added).

Since the ADEAAA contains the identical "because of" language as does Title VII, the legal analysis of Justice Gorsuch's majority opinion in *Bostock* must extend to workplace discriminations suits brought under the ADEAAA. Plaintiffs like Plaintiff-Appellant Melanie Pelcha can survive summary judgment if she can present evidence which, if credited by a jury, would allow it to find that age was *a* "but-for" cause of  her termination, even if her employer may have been motivated by other reasons for terminating her.

The impact of *Bostock* on this case is more than theoretical.  *Bostock* significantly alters the burden of proof challenges facing employees when they are attempting to prove their case solely by the introduction of circumstantial or "indirect evidence." Under the well-established *McDonnell Douglas* framework, after the employee makes out her *prima facie* case, and the employer then meets its minimal burden of articulating a non-discriminatory basis for its decision to terminate the employee, the burden then shifts to the employee to show that the

reason proffered by the employer was a pretext to hide the employer's true

unlawful motivation for her termination, which in this case would be her age.

*McDonnell Douglas Corp. v. Green*, 411 U.S.792, 802 (1973); *Miles v. South*

*Central Human Resource Agency*, 946 F.3d 883, 887 (6th Cir. 2020).

Prior to *Bostock*, this final burden with which age discrimination plaintiffs

have been saddled has been onerous, and thus is the reason why a disproportionate

number of employment discrimination lawsuits are dismissed by District Courts on

summary judgment.  And why these dismissals are, far more often than not, upheld

by the Sixth Circuit and other Circuit Courts of Appeal.  A plaintiff's burden is

onerous because of the binary choice confronting her in demonstrating the

employer's motivation for terminating her.  It is either age-related, or it is

something else which isn't age-related.  And when the employer articulates, as it

must, that it was "something else," it will prevail in the litigation, unless the

employee can somehow overcome this presumption and meet her burden of

showing that the employer's posited reason  was used  as a pretext to hide the real

age-biased motivation for her termination.  If, however, she cannot meet her

burden, the Court will by default regard the employer's termination as

independently motivated.  And under the Court's pre-*Bostock* binary framework, it

must naturally follow that the presence of an age-based reason would be an

impossibility.  The two reasons simply cannot co-exist.  It is "either-or".

The lower court's decision in this case pre-dated *Bostock* by two months.  So the question before this Court, one that could not have been  addressed by the lower court, is how *Bostock* might impact, and perhaps ease, an employee's *McDonnell Douglas* burden of making out a case of age discrimination through reliance solely on circumstantial, or indirect evidence? Plaintiff will address this issue *infra,* in the "Indirect Evidence" section of her Memorandum.

### B.    NIESEN'S AGEIST STATEMENTS CONSTITUTED DIRECT EVIDENCE OF DISCRIMINATION.

Intentional discrimination may be shown by direct or indirect evidence. *Griffith v. City of Des Moines*, 387 F.3d 733, 736 (8th Cir. 2004). Under the "mixed-motives test" established in *Price Waterhouse*, if there is direct evidence of race discrimination, the burden rests with the employer to show that it more likely than not would have made the same decision without consideration of the illegitimate factor. *King v. Hardesty*, 517 F.3d 1049 (8th Cir. 2008), citing *Kratzer v. Rockwell Collins, Inc.*, 398 F.3d 1040, 1046 (8th Cir. 2005) (citing *Price Waterhouse v. Hopkins*, 490 U.S. 228, 258, 109 S. Ct. 1775, 104 L. Ed. 2d 268 (1989)).

"At the summary judgment stage, the issue is whether the plaintiff has sufficient evidence that unlawful discrimination was *a* motivating factor in the defendant's adverse employment action. If so, the presence of additional legitimate motives will not entitle the defendant[s] to summary judgment." *Griffith*, 387 F.3d

at 735 (emphasis in original). "Therefore, evidence of additional motives, and the question whether the presence of mixed motives defeats all or some part of plaintiff's claim, are trial issues, not summary judgment issues." *King v. Hardesty*, *citing Griffith v. City of Des Moines*, 387 F.3d 733 (8th Cir. 2004) *and Kratzer*, 398 F.3d at 1046 ("Evidence of the employer's motives for the action, and whether the presence of ... mixed motives defeats the plaintiff's claim, is a trial issue, not intended for summary judgment").

A plaintiff may proceed under the *Price Waterhouse* mixed-motives test if she produces direct evidence of conduct or statements by persons involved in the decision-making process, which indicate a discriminatory attitude was more likely than not a motivating factor in employer's decision. *Conti v. American Axle and Manufacturing, Inc.*, 326 Fed. Appx. 900 (6th Cir. 2009); *LaPointe v. United Autoworkers Local 600*, 8 F.3d 376, 379-381 (6th Cir. 1993), *citing Ang. v. Procter & Gamble Co.*, 932 F.2d 540, 549, *see also, Trans World Airlines, Inc. v. Thurston*, 469 U.S. 111, 121, 105 S. Ct. 613, 621-622, 83 L. Ed. 2d 523 (1985).

In *Conti v. American Axle and Manufacturing, Inc.*, *supra*, the Sixth Circuit held that there is no requirement to meet the direct evidence standard that every discriminatory allegation and every piece of evidence pertain directly to the adverse actions taken against the Plaintiff. *Id*. at 910, citing, *See Harrison*, 572 N.W.2d at 683 (citing *Kresnak v. City of Muskegon Heights*, 956 F. Supp. 1327,

1335 (W.D. Mich. 1997) (noting that negative statements and racial slurs are sufficient to establish a prima facie case and survive summary judgment even if those comments were not directed at, or made about, the plaintiff directly) (citing *LaPointe v. United Autoworkers Local 600*, 8 F.3d 376, 380 (6th Cir. 1993), and *Talley v. Bravo Pitino Restaurant, Inc.*, 61 F.3d 1241, 1249 (6th Cir. 1995)).

*In LaPointe v. United Autoworkers Local 600*, *supra*, The Sixth Circuit Court of Appeals held that the plaintiff, LaPointe, had established direct evidence of discrimination through deposition testimony of his predecessor, George Wheeler, also terminated by the same decision maker. *Id*. at 380. Wheeler testified that the decision maker both in his case and in LaPointe's, Thompson, had made "off the wall" remarks about people with thirty years of experience having to retire to make room for younger employees. *Id*. at 380. Hence, even though Thompson didn't make those remarks directly to the plaintiff, LaPointe, the Sixth Circuit held that such remarks were direct evidence of age discrimination. *Id.*

Similarly, in *Cooley v. Carmike Cinemas, Inc.*, 25 F.3d 1325 (6th Cir. 1994), this Circuit exercised a broader view of direct evidence, weighing numerous factors such as whether the comments were made within the scope of employment; whether related to the decision-making process; whether they were more than vague, ambiguous, or isolated; and whether they were made at the time of the termination. Id. at 1330. Applying a balancing test, the Court held that the plaintiff,

Cooley, elicited other witness comments that the decision maker, Patrick, wanted a younger work force and felt uncomfortable around older people. *Id.* at 1331.

The Eighth Circuit Court of Appeals has held that direct evidence within the meaning of *Price Waterhouse* may include "evidence of actions or remarks of the employer that reflect a discriminatory attitude," "comments which demonstrate a discriminatory animus in the decisional process," or comments "uttered by individuals closely involved in employment decisions." *Beshears v. Asbill*, 930 F.2d 1348, 1354 (8th Cir. 1991).

When relying on direct evidence to avoid summary judgment, the plaintiff must provide evidence:

> showing a specific link between the alleged discriminatory animus and the challenged decision, sufficient to support a finding by a reasonable fact finder that an illegitimate criterion actually motivated the adverse employment action. Thus, "direct" refers to the causal strength of the proof, not whether it is "circumstantial" evidence. A plaintiff with strong (direct) evidence that illegal discrimination motivated the employer's adverse action does not need the three-part *McDonnell Douglas* analysis to get to the jury, regardless of whether his strong evidence is circumstantial.

*Griffith*, 387 F.3d at 736 (citation and punctuation omitted).

In *King*, the Eighth Circuit held that a school administrator's statement to a substitute teacher, an African-American, that "white people teach black kids...better than someone from their own race," constituted direct evidence that race was a motivating factor in administrator's decision to terminate her from

28

school and not assign her to homebound instructions hours. *Id*. at 1057-1059.  It was not necessary that the decisionmaker's race-biased comments be made about the plaintiff-employee in particular. Negativity directed towards African-American teachers *as a class* would suffice.   The Court held that the "white people teach black kids better" comment revealed "a decidedly negative attitude *toward [African–American] people* on the part of [a person] responsible for [the employment decision]." *Id*. at 1059. (emphasis added).

The Eleventh Circuit Court of Appeals has a similar analysis, defining direct evidence of discrimination as evidence reflecting "a discriminatory or retaliatory attitude correlating to the discrimination or retaliatory attitude complained of by the employee." *Wilson v. B/E Aerospace*, *Inc.*, 376 F.3d 1079, 1086; *Damon v. Fleming Supermarkets of Fla., Inc.*, 196 F.3d 1354, 1358 (11th Cir. 1999). "[O]nly the most blatant remarks, whose intent could be nothing other than to discriminate

on the basis of age, ... constitute direct evidence of discrimination." *Carter v. City of Miami*, 870 F.2d 578, 581 (11th Cir. 1989).[2]

As stated above, Niesen made a number of disparaging comments against older employees. For example, he repeatedly referred to an older bank teller, Becky Roush as "too old", having a "limited shelf life" and having reached or passed her "expiration date." He expressed those exact words to Janet Schneider, Brenda Sonderman and Lindsay Crothers. (Schneider deposition, RE 50-3. Page ID # 894; Sonderman deposition, RE 50-5, Page ID # 919; Crothers deposition, RE 50-6, Page ID # 926). Niesen instructed Schneider and Sonderman to reduce Roush's hours until Roush quit her employment. (Schneider deposition, RE 50-3, Page ID # 894; Sonderman deposition, RE 50-5, Page ID # 919).

Niesen also repeatedly expressed his desire to hire younger tellers. He contended they were savvy, would attract younger customers and the tellers'

---

[2] During oral argument to the lower court, counsel for all parties were instructed to file, within a week, letters to the Court citing cases which would support their respective positions on the definition of "direct evidence." (See Minute Entry, without a corresponding RE number, entered onto the Docket of this case, dated January 28, 2020). Pursuant thereto, Plaintiff's counsel timely sent the lower court on February 4, 2020 a letter listing various cases in support of its definition of "direct evidence." It is attached hereto as Attachment A. Neither Plaintiff's nor Defendants' letters were included in the lower court's docket. In Plaintiff's letter cited to the lower court, several supporting cases, including *LaPointe*, *Cooley*, *Carmike and King*, *supra*. However the lower court did not mention them or address them in its Opinion and Order.

parents. (Schneider deposition, RE 50-3, Page ID # 893; Crothers deposition, RE

50-6, Page ID 3 926 927).

> ### C.  PLAINTIFF MELANIE PELCHA HAS MET HER BURDEN OF ADDUCING SUFFICIENT CIRCUMSTANTIAL, OR INDIRECT,  EVIDENCE WHEREBY A JURY COULD CONCLUDE THAT THE REASON PROFFERED BY DEFENDANTS FOR TERMINATING  HER WAS A PRETEXT, AND INSTEAD FIND THAT DEFENDANTS TERMINATED HER BECAUSE OF HER AGE.

The lower court has found that Plaintiff made out all of the prongs of her

*prima facie* case.  It has further found that Defendants met their minimal burden of

articulating its reason for terminating Plaintiff, namely  for her willful refusal to

comply with a new rule promulgated by her supervisor that she fill out a written

request form in advance of taking leave during the workday, which Defendant's

regarded as intolerable "insubordination."   However, the lower court proceeded to

grant Defendant's Watch Hill Bank's Motion for Summary Judgment on the

grounds that Plaintiff failed to meet her burden of demonstrating that the

insubordination reason articulated by Defendants was a pretext to conceal its real

motivation for terminating her, which was her age.  Plaintiff respectfully takes

exception to the lower court's ruling and submits that she did in fact meet her

burden for all of the reasons set forth below.

As the lower court properly held, a plaintiff can meet her burden of

refutation in one of many ways, usually by demonstrating that the defendant's

proffered reason (1) had no basis in fact, (2) did not actually motivate defendant's decision to terminate plaintiff, or (3) was not sufficient to warrant plaintiff's termination. Plaintiff respectfully submits that she has adduced sufficient evidence whereby a jury could conclude that Defendant's decision to terminate her, ostensibly for insubordination, was merely a pretext to hide its real motivation to fire her because of her age.  She can show this through all of the three enumerated methods.

### 1.    THE REASON PROFFERED BY DEFENDANTS HAD NO BASIS IN FACT.

While Plaintiff-Appellant agrees that it is well-established  Sixth Circuit law that insubordination is a legitimate basis for an employer's termination, a primary error the lower Court made in *Pelcha* is equating Appellant Pelcha with the plaintiffs in *Raadschelders v. Columbus State Comm. Coll.*, 377 F. Supp. 844, 858 (S.D. Ohio 2019) and *Fullen v. City of Columbus*, 514 F. App'x 601, 606 (6th Cir. 2013). These were the two cases on which the lower court most relied in applying insubordination as a legitimate basis for Pelcha's termination. (District Court Opinion and Order. RE 60. Page ID # 1238-1239).   However, Pelcha's situation was far different than the plaintiffs in these aforementioned precedents.

a.    In *Raadschelders v. Columbus State Comm. Coll.*, *supra*, the plaintiff, Dr. Julie Raadschelders, served as the Chairwoman of the Social Sciences Department. *Id*. at 849.  During an April 11, 2016, meeting,

32

the plaintiff, Dr. Tracy Little, a Social Sciences Department Faculty

Member and Senior Vice President of Academic Affairs, Jack Cooley,

met to discuss the development of Criminology courses for the Social

Sciences Department. *Id*. at 850.   During that meeting, the plaintiff

grew angry and Vice President Cooley believed she was angered by

his skepticism regarding decisions made by the college's curriculum

committee. *Id*.   After the meeting, Vice President Cooley and Dr.

Raadschelders never interacted again. Id.  at 851.  Moreover, Cooley

took that last, and only, impression with him to the University Dean,

Dr. Alysen Todd, who decided to reprimand the plaintiff in writing..

*Id*.  However, when the human resources representative informed

Dean Todd that Dr. Raadschelders was disinclined to accept any kind

of reprimand because she felt justified in continuing to advocate for

her position, Dean Todd then recommended the plaintiff's

termination. *Id*. at 852.

b.    Similarly, in *Fullen v. City of Columbus*, *supra,* the plaintiff, Wesley

Fullen, was an officer in the City of Columbus Division of Fire

("CDF"). The CDF Chief ordered Fullen on at least two occasions to

be interviewed as part of an investigation with the union

representative present. Id. at 604.   Fullen refused to follow those

33

orders. Id. Following a hearing, the CDF Chief recommended Fullen's termination. *Id*. Neither the lower Court nor the Sixth Circuit accepted Fullen's argument that he believed the Chief's written and verbal orders to be illegal and, as such, he could disregard them. *Id*. at 606. As such, the Circuit Court upheld the termination. *Id*. at 609.

c.   In the case at bar, by contrast, while Pelcha at first informed her supervisor that she was unwilling to follow the requirement of completing the written form, ultimately, she did so. Sonderman deposition, RE 50-5, Page ID # 913.  After completing the form, Pelcha placed it in Sonderman's office.  Sonderman admitted in her deposition that Pelcha turned in the requisite form on July 7, 2016, the day before Pelcha planned to leave for two hours to take her son to the dentist *Id*., Page ID # 910.  Furthermore --- and this is crucial --- Greg Niesen knew full well, *prior to* Pelcha's July 12, 2016 termination,  that Pelcha had turned in the required form on July 7. Om the first page of her early morning July 12, 2016 Memo, Sonderman advised Niesen that "Prior to Melanie leaving for the appointment, *she did complete the form as required.*" (Exhibit 6 filed with Plaintiff-Appellant's Memo Contra, RE 50-8, Page ID 930)  (See especially the last sentence in Sonderman's indented paragraph No. 1)) (emphasis added).   In addition, Pelcha

34

consulted with Joe Vortkamp, the Defendant's Controller and a Senior Vice President, who did not advise her that she had to follow the supervisor's instruction.  Rather, he referred her to the current employee handbook for guidance as to the bank's company-wide policies regarding the at-issue requirement. (Exhibit 31, filed with Plaintiff-Appellant's Memo Contra, RE 50-8, Page ID # 985)   Even though Pelcha reviewed the handbook and concluded that no bank-wide policy existed consistent with Sonderman's new requirement, she didn't remain committed to that position, as did the plaintiff in *Fullen*.  She ultimately demonstrated that she was subordinate.

d.    While it is true that Pelcha may have missed the deadline for handing the form in, Defendants' termination reason was not missing the deadline. Rather, it was Pelcha's *refusal to complete the form*, thereby representing that she was not planning on abiding by the policy in the future.  Hence, the lower court's reliance on *Raadschelders v. Columbus State Comm. Coll*., *supra,* and *Fullen v. City of Columbus*, *supra*, is misplaced. Those cases pertained to plaintiffs who truly stuck by their positions, and because those plaintiffs believed in the justness of their cause, they ultimately refused to show allegiance to the employer. Those precedents dealt with a downright refusal to

follow a policy, while the case at bar involves a situation where the employee initially indicated she did not want to follow a policy, but ultimately submitted to the policy. As stated above, both Niesen and Sonderman were aware of Pelcha's capitulation to the rule prior to her termination.   Sonderman deposition, RE 50-5, Page ID # 913;Exhibit 6, RE 50-8, Page ID # 930.

e.  *Raadschelder* and *Fullen* also did not pertain to situations in which the employee asked a more senior company officer as to the legitimacy of the first line supervisor's rule. Pelcha did that very action and the controller did not issue her the same order as the first-line supervisor. As such, the instant case is not an insubordination case.

f.  As such, This Court can better appreciate the other suspect issues with the termination. There is certainly an issue of fact with respect to the actual decision maker responsible for terminating Pelcha.  Niesen contended that the impetus for terminating Pelcha came from Sonderman, her first line supervisor, through her July 12, 2016, 8:26 am. email, in which Sonderman included examples of Pelcha's alled failure to complete assigned tasks. (Exhibit 6, RE 50-8, Page ID # 930) . Sonderman sharply contended the opposite, *i.e.,* testifying that  Niesen

ordered her to issue the recommendation for Pelcha's termination, and cite reasons. Sonderman deposition, RE 50-5, Page ID # 915-916).

g.  Even if Sonderman stood by the examples of deficient work performance in her July 11, 2016, 8:26 am. email to Niesen, the key question of law is not whether the employee deserved to be terminated.  It's not for a Court to make that determination. Rather, the relevant inquiry is whether the employer would have terminated the employee absent the protected characteristic, in this case Pelcha's age.  Sonderman, notwithstanding the examples of Pelcha's shortcomings, was steadfast in her conclusion that she was not in favor of terminating the Plaintiff. (Sonderman deposition, RE 50-5, Page ID # 911).

h.  Consequently, this case is not only one in which there is an issue of fact as to the identity of the decision maker, but rather it is a case in which one out of two possible decisionmakers testified that he or she would not have terminated Pelcha. Along with this doubt comes the termination reason additional to insubordination that Niesen asserted on July 11, 2016, namely "work issues." (Niesen deposition, RE 50-2, Page ID # 873) At that point on July 11, 2016, Niesen couldn't provide any specifics for those "work issues". (*Id*.). Ultimately, at the

termination meeting, he reverted back to insubordination as the ultimate reason.

i.  Furthermore, the company handbook is relevant not only to demonstrate that the Company didn't follow its own policy when it didn't consult Human Resources and/or investigate the employee's wrongdoing,.  But had Defendants followed their own policy and had Human Resources conduct an investigation into Pelcha's alleged misconduct, it is very likely that at the forefront, it  would have surfaced that Pelcha ultimately completed the form. Consequently, she didn't deserve termination because she wasn't insubordinate.

In sum, Pelcha has adduced credible evidence in a jury could easily find that the reason proffered by Defendants for terminating her had no basis in fact, and thus conclude that her termination was pretextual.

2.  **ASSUMING, *ARGUENDO*, THAT PLAINTIFF PELCHA DID ENGAGE IN INSUBORDINATION AS ALLEGED, THAT WAS NOT DEFENDANT'S MOTIVATION BEHIND HER TERMINATION.  SHE WAS FIRED BECAUSE OF HER AGE.**

Plaintiff has already argued *supra* that Defendant's President and primary decision-maker Gregory Niesen made numerous age-biased statements which this Court should regard as *direct evidence* of age discrimination.  However, assuming *arguendo*, that these statements taken together did not, as the lower court has held,

38

measure up to direct evidence of Defendant's age-biased motivation behind Plaintiff's termination, it can certainly still be regarded as indirect evidence of such an unlawful motivation.  Even the lower court conceded as much (Lower Court's Opinion and Order RE 60, Page ID # 1248).

Plaintiff has adduced credible evidence that Defendant's prime decision-maker made several age-biased remarks.  They have been addressed in greater detail in the "Direct Evidence" section of this Memorandum and need not further be discussed in detail here.  Some of them referenced an older worker, Becky Roush,  as having  a "limited shelf-life" and having passed her "expiration date" Others indicated Niesen's clear preference for younger bank tellers who were more tech savvy, related more easily to younger customers, and could be utilized  as a conduit to secure the business of their wealthier parents.  Even though these statements were made by a high-level decision-maker, the lower court dismissed all of these statements as non-indicative of indirect evidence of age discrimination.

Addressing first the statements concerning Ms. Roush, the lower court pored over the phrases "expiration date" and "limited shelf life" and characterized them as "not unambiguously ageist", and that they "*arguably* related to duration rather than age" (*Id*. at Page ID # 1250) (emphasis added).  What the lower court was essentially saying is that Niesen's disparaging words about Ms. Roush were ambiguous.  They "could" be regarded as ageist, and they "could", as the lower

court opined, relate to her "duration", whatever that might mean in the context of this case.    But at the summary judgment stage, it is not the province of the lower court to be opining either way on statements it itself views as ambiguous.  Such ambiguities should be resolved in favor of the non-movant plaintiff.  A jury would certainly be in a better position to weigh "shelf-life" and "passed her expiration date", and whether or not to regard them as being age-related and age biased. *Conti v. American Axle supra* at 913.   The lower court plainly erred by taking this decision away from the jury and arrogating it unto itself.

Turning to Mr.  Niesen's preference for younger bank tellers, the lower court dismisses that too, citing language from *Miles v. South Central Human Resource Agency*, 946 F.3d 883, 896 (6th Cir. 2020),  that even if the employer wanted to attract young people, that said nothing about terminating older employees. Further, the terminated plaintiff would not be in competition with younger hires, since she had been occupying a high-level management position.  However, *Miles* is clearly distinguishable from the facts in this case.  To begin with, in *Miles*, the employer had formulated a strategic plan to hire younger workers in general at college fairs. *Miles* at 896.  In the instant case by contrast, Mr. Niesen's preferences were more classification-specific-- *younger bank tellers* -- including those who were already incumbent employees working in that position.  Even more importantly, in *Miles*, the employer's plan was aspirational and general, to go after younger employees as

40

a long-term strategy. Any such employee would not pose a threat to replace the

plaintiff who was in a high-level management job no new hire could possibly hope

to take over. In the instant case however, Mr. Niesen's open preference was,

unlike the employer's goal in *Miles*, to pursue for hire young bank tellers to occupy

the same classification that protected employee Plaintiff Melanie Pelcha happened

to occupy. Younger hires were in competition for Plaintiff's job. Getting rid of

Plaintiff would offer Mr. Niesen the very opportunity to fulfill his stated

preferences and goals. A jury evaluating Mr. Niesen's ageist statements could

easily conclude that Defendant's truly terminated Plaintiff not because she was

insubordinate but rather because it preferred younger employees in her position.

3. **ASSUMING, *ARGUENDO*, THAT PLAITIFF PELCHA DID ENGAGE IN INSUBORDINATION AS ALLEGED, THAT ALLEGED OFFENSE WAS INSUFFICIENT TO WARRANT PLAINTIFF'S TERMINATION.**

a. **Defendants attempted to offer shifting reasons for terminating Plaintiff.**

The lower court rejected Plaintiff's argument that Defendants' shifting

grounds for terminating her was evidence of pretext. It reasoned that there never

existed any shift. Mr. Niesen had decided to terminate Plaintiff for

"insubordination" immediately upon learning second-hand on Friday, July 8, 2016

that Plaintiff had refused to turn in a written request form for permission to take off

two hours that day to take her son to the dentist. And during Mr. Niesen's exit

interview with Plaintiff on the afternoon of Tuesday, July 12, he stuck to that basis for her termination---insubordination for failing to turn in the form.   So, there was no "shift" after all. (Lower Court's Opinion and Order, RE 60. Page ID # 1241). And the record evidence is consistent with that conclusion.  (Pelcha deposition, RE 50-1,Page ID # 861)

However, what the lower court omits from its analysis is that, at some point between July 8 and July 12, Mr. Niesen abandoned the idea of terminating Plaintiff for insubordination.  Perhaps having second thoughts about firing her for such a relatively minor offense, he cast about for another, more defendable, reason to let her go.  With that in mind, he approached Plaintiff's supervisor Brenda Sonderman on or before early Tuesday morning, July 12, and solicited her to draft a memo to him outlining all of Plaintiff's shortcomings and containing her "recommendation" that Plaintiff be let go for those reasons. Ms. Sonderman had never planned on writing such a memorandum and did not want to do Niesen's bidding, and she definitely did not want Plaintiff to be terminated.  However, given Mr. Niesen's pressure, she felt she had no other choice.[3]

As it turns out, Mr. Niesen ultimately reversed course and later that day returned to his original reason for terminating her, her insubordinate refusal to fill

---

[3] This entire interaction between Mr. Niesen and Ms Sonderman has been outlined in Sonderman deposition, RE 50-5, Page ID # 915.

out the request form.   But Niesen's earlier attempt to change the narrative by
procuring Ms. Sonderman's forced "recommendation" is very telling.   Back on
July 8, Mr. Niesen was quick to condemn Plaintiff for insubordination and publicly
announced his intent to fire her.   Yet in his deposition, Mr. Niesen declared  that he
had *no* intention whatsoever to fire Plaintiff for any reason until Ms. Sonderman
*sua sponte* submitted her "voluntary"  critical memorandum recommending
Plaintiff's termination. Nisen deposition, RE 50-3, Page ID  # 880). Why would
Niesen change his position?   And how do Defendants explain their own supervisor
Sonderman disputing Niesen by testifying that Niesen coerced her
recommendation?   A trier of fact, faced with such a curious chain of events, could
easily find Defendant's rationale for terminating Plaintiff sufficiently suspicious to
conclude that it was pretextual.

 The lower court recognized the well-established doctrine that an employer's
shifting of its rationale for terminating an employee is evidence of pretext. (RE 60,
Page ID # 1241).  However, the lower court then reasoned that this doctrine is
inapplicable when the employer shifts its rationale from one reason to another
reason which is "not in conflict" with the first.  (*Id*. at Page ID # 1242).   The lower
court cites no legal authority for such a proposition.  Further, it makes no sense.   If
an employer suddenly decides to fire an employee for, say, selling drugs in the
workplace, and later abandons that reason without any basis, and then decides to

fire the employee for tardiness, the two reasons are still "in conflict" with each other.  The same is true in the instant case.   Niesen first wanted to fire Plaintiff for refusing to fill out the form.  Later he procured a forced recommendation from Ms. Sonderman that Plaintiff be fired for poor work product, bad attitude, and a host of other different and "conflicting" reasons.   The Sixth Circuit has long recognized the ability of an employee to establish sufficient pretext to survive summary judgement when it can show that the circumstances and rationale behind an employer's termination decision is "fishy and suspicious". *Gooden v. Knoll, Inc*., 803 Fed. App'x 892, 896 (6th Cir. 2020), citing *Smith v. Chrysler Corp*., 155 F.3d 799, 806, 809 (6th Cir. 1998). Clearly, a jury could regard Niesen's antics in attempting to create shifting rationales for terminating Plaintiff sufficiently "fishy and suspicious" to find pretext.

> **b.**    **Defendants subjected Plaintiff to disparate treatment.**

Plaintiff presented credible evidence to the lower court that a number of younger employees had been treated far more leniently than she for engaging in a wide variety of misconduct but were not terminated.   Plaintiff directed the lower court in particular to the case of Becky Firestone, a young employee under 40 years of age, who on more than one occasion took sporadic leave without filling out the required written request form. Ms. Firestone was in the same department as Plaintiff.  Both served as tellers and both were in the same chain of supervision.

Plaintiff was terminated, allegedly for not turning in her form, but Ms. Firestone was not. She was not even reprimanded or otherwise disciplined. The lower court was faced with a classic case of disparate treatment, under well-established Sixth Circuit law. *Louzon v. Ford Motor Co*., 718 F.3d 556, 557 (6th Cir. 2013); *Barnes v. City of Cincinnati*, 401 F.3d 729, 736 (6th Cir. 2005). Plaintiff and Ms. Firestone were similarly situated in terms of job classification, supervisor, and nature of the alleged offense. The lower court conceded that. (RE 60, Page ID # 1246). It nonetheless rejected Plaintiff's disparate treatment argument on the basis that there was no record evidence that Ms. Firestone engaged in the same insubordination as had Plaintiff. The lower court cited Ms. Firestone's deposition testimony offered by Defendants that on a number of occasions she did submit written leave request forms. (*Id.).* However, the lower court ignored altogether other deposition testimony by Firestone proffered by Plaintiff that on other occasions, Firestone had not filled out the leave request form, and never suffered any discipline or other adverse repercussions:

Q: (by Mr. Hordes) **And how long on the average would you be gone when you had doctors' appointments?**

MS. MILLER **Object to the form. Go ahead.**

A. (by Ms. Firestone) Typically about an hour to two.

MR. HORDES

Q. **All right.**

45

A. Hour, two hours, depending on –

Q. **And when you did that, did you ever - - I'm talking about after May of 2016 forward to the end of your employment –did you fill out a written request to take time off to see the doctor?**

A. I do not recall filling out a form to take time off to see the doctor.

Q. **Were there times in which you had to run other errands like going to Walgreens or CVS to pick up a prescription or go to the drugstore to pick up some other items?**

A. I did have a couple of times where I had to pick up a prescription.

Q. **Did you fill out a written request form to do that?**

A. *I did not.*

Q. **Did anyone ever come to you and say, you know, you should have filled out a form, I'm warning you, next time you better fill out that form?**

A. *No.*

Excerpts from the Deposition of Rebecca Firestone filed with Plaintiff-Appellant's

Memorandum Contra (RE 50-4, Page ID # 898) (emphasis added).

Upon redirect questioning by Defendant's counsel, Ms. Firestone went on to

identify three separate request forms that she had in fact filled out during her

employment with Defendants, as the lower court duly noted. (RE 60. Page ID #

1246).  However, the lower court ignored the following crucial follow up questions

of Ms. Firestone by Plaintiff's counsel.

Q.  (by Mr. Hordes)

**Okay, so two of the three you were taking one whole day or multiple days and on the middle one you may have taken off the entire afternoon, or maybe not, maybe you came back, you just don't remember?**

A.  (by Ms. Firestone) Correct.

Q.  **But you also testified earlier, and I just want to make sure I understand, there were *other occasions* where you would  go to a pharmacy or doctor during the day and come back, *and not fill out the request form?***

A.  *That is correct*.

(Excerpts from the Deposition of Rebecca Firestone filed with Defendant's

Watch Hill Bank's Reply Memorandum in support of its Motion for Summary

Judgment, RE 54-2, Page ID # 1144) (emphasis added).

Based on the totality of the deposition testimony of Rebecca Firestone, a

jury would certainly be entitled to find that Defendants subjected Plaintiff to

disparate treatment, and thus conclude that its articulated reason for terminating

her was pretextual.

      c.    <u>**Defendants' termination of Plaintiff without first affording her progressive discipline was contrary to their well-established personnel policies contained in its Employee Guide.**</u>

As noted in the "FACTS" Section of Plaintiff's Appellate Memorandum,

Defendants maintained in effect at the time of Plaintiff's termination, an Employee

Guide which contained a Corrective Action Plan wherein  progressive discipline

was "typically" implemented.  (Exhibit 8 to Plaintiff-Appellant's Memo Contra,

RE 50-8, Page ID # 971-972).   However, Defendants chose not to accord Plaintiff the courtesy of progressive discipline.  Instead, they fired her outright for her first offense of any kind.  Up until then. she had a clean record and was well regarded by her past supervisors.  (Exhibit 23 to Plaintiff-Appellant's Memo Contra, RE 50-8, Page ID # 978. .  Plaintiff cited this departure from company policy as another example of pretext.

The lower court held that Defendant's failure to follow its internal disciplinary policy did not establish pretext, citing *Steele v. Edward D. Jones & Co., L.P.*, 780 F. App'x 313, 317 (6th Cir. 2019).  However, there is nothing in *Steele* which supports the lower court's position. In fact, just the opposite is true. *Steele* noted the plaintiff had been given a chance to participate in a collaborative discussion as to what sort of discipline should be meted out but was fired only after she refused to accept responsibility for her actions. *Steele* at 317.

The lower court has taken the extreme position that saving language like "Employment at Will" declarations and the progressive discipline disclaimers like the ones contained in Defendants' Employee Guide gives an employer *carte blanche* authority to ignore its procedures whenever it feels like it, thereby insulating itself against an accusation of unlawful pretext (citing *White v. Columbus Metro Hous. Authority*, 429 F.3d 232, 246 (6th Cir. 2005). (Lower Court's Opinion and Order, RE 60, Page ID # 1252).   However, later Sixth Circuit

decisions addressing this issue have taken a more balanced and cautionary

approach.  In *Lamer v. Metaldyne Co*., 240 F. App'x 22 (6th Cir. 2007), the Court

held that such savings language "does not give it [the employer] license to do so

[violate its own rules and polices] for reasons prohibited by law" (*Lamer* at 32-

33).  Similarly, in *Fullen v. City of Columbus*,514 Fed App'x 601 (6th Cir. 2013)

the Court stated that an employer can be held legally accountable  for selective

enforcement of its otherwise lawful policies "if the selective treatment was

motivated by an intention to discriminate on the basis of impermissible

considerations, such as race or religion . ." (*Fullen* at 610).

　　　The lower court further reasoned that "Insubordination, for which Niesen

*claims* he had 'zero tolerance' may not necessarily result in progressive discipline,

but instead *could* be 'serious enough' to warrant immediate termination"  (RE 60,

Page ID #  1253).   However, by doing so, the lower court basically deferred to and

wholly adopted Niesen's version of events as well as  his subjective opinion on

what he thought was "serious enough" to warrant Plaintiff's immediate

termination,  rather than a lesser form of discipline for an 11 year employee with a

clean record.  Maybe Plaintiff's conduct (assuming it actually took place) was

serious enough to warrant discharge, but that is a question of fact for the jury, not

the Court,  to answer, after looking at all of the suspicious evidence of pretext

surrounding Plaintiff's termination, as outlined above.[4]

**D.    ASSUMING, *ARGUENDO,* THAT THIS COURT FINDS THAT
PLAINTIFF HAS NOT ADDUCED SUFFICIENT DIRECT OR
INDIRECT EVIDENCE WHEREIN A JURY COULD CONCLUDE
THAT DEFENDANTS TERMINATED HER BECAUSE OF HER
AGE, THE COURT SHOULD REMAND THE CASE BACK TO THE
LOWER COURT FOR FURTHER CONSIDERATION AND
ANALYSIS IN LIGHT OF THE U.S. SUPREME COURT'S RECENT
HOLDING IN *BOSTOCK V. CLAYTON COUNTY,*  140 S. Ct. 1731
(2020).**

The U.S. Supreme Court in *Bostock v. Clayton County* held for the first time

that employees  need not be faced with the prospect of two mutually-exclusive

binary choices when attempting to show that the employer's articulated non-

discriminatory motive behind his/her termination was not *the* true "but-for" reason,

in order to demonstrate the existence of *the* sole alternative discriminatory motive.

Rather, there might exist more than one possible reasons why an employer

terminated an employee, and as long as the plaintiff employee can establish that

the discriminatory reason was *one* of them, her case can proceed to trial.

---

[4] The lower court also asserts that Plaintiff did not in any event proffer any
evidence that younger employees were afforded progressive discipline after
engaging in acts of insubordination (*Id*.)  That is not correct.  Plaintiff did proffer
such evidence. (Exhibit 38, Defendants' Memo to Firestone and Vortkamp, filed
with Plaintiff-Appellant's Memo Contra, RE 50-8, Page ID #986). But even
putting this aside, Plaintiff is not arguing disparate treatment in this particular
section of her Appellate Brief.  That issue was already addressed separately *supra*.

*Bostock*, Plaintiff respectfully submits, alters the burden-shifting paradigm in employment discrimination cases originally laid out in *McDonnell Douglas*, *supra*. If an employee like Plaintiff can now prevail by demonstrating that her age was one among one or more other reasons motivating her employer to terminate her, the overarching importance of her satisfying the third prong of *McDonnell Douglas*, that the employer's reason for terminating her was invalid, diminishes. Let us assume that Plaintiff is unable to meet that burden. Let us assume that Defendant's did in fact have a plausible reason ---insubordination ---for terminating her. Under *Bostock*, that would no longer result in summary judgment being taken against her. She could still proceed to trial and prevail if she could establish that the other reason, her age, was the true motivation for her termination. When faced with the existence two plausible but conflicting motivations for an employee's termination, the lower court should no longer automatically grant summary judgment to Defendants based on the existence of their plausible reason but should instead allow the case to go to a jury, which would be in a far better position than the lower court to evaluate all of the evidence, sort out the conflicting motivations, and decide which motivation, age or insubordination, was the true "but-for" reason in this case.

*McDonnell Douglas* would be not be abrogated altogether. Plaintiff would still be tasked with meeting her burden of proof to show that the real "but-for"

reason for her termination was her age, not her alleged insubordination.  But it would be in the context of her trial before the jury, rather than before the lower court at the summary judgment stage.

The lower court in this case did not have the benefit of *Bostock* at the time it wrote its Opinion and Order, since *Bostock* was handed down two months later.  It might have applied the *McDonnell Douglas* burden-shifting formula differently in light of *Bostock's* holding that two motivations for termination may co-exist, and an employee may prevail at trial if it can prove than the true "but-for" reason was ther age.  .  Therefore, assuming, *arguendo,* that this Court finds that Plaintiff has not already adduced sufficient direct or indirect evidence wherein a jury could conclude that Defendants terminated her because of her age, this Court should remand the case back to the lower court for further consideration and analysis in light of *Bostock.*

## VIII.  <u>CONCLUSION</u>

For all of the foregoing reasons, Plaintiff requests this Court to reverse the lower court's granting of Defendant's Motion for Summary Judgment and remand the case back to the lower court either for the holding  of a trial on all of the allegations contained in Plaintiff's Complaint, or for further consideration in light of *Bostock v. Clayton County.*

Respectfully submitted,

/s/ Donald B. Hordes_____
Donald B. Hordes (0014212)
1 E. Fourth Street, Suite 700
Cincinnati, OH  45202
Tel: (513) 381-5700
Direct: (513) 744-7735
Fax: (513) 381-0014
dhordes@ritter-randolph.com
*Attorney for Plaintiff-Appellant*
*Melanie Pelcha*

Respectfully submitted,

/s/ Paul Plotsker_____
Paul Plotsker (087475)
6761 Meadow Ridge Lane
Cincinnati, OH 45237
Tel. No. 513-826-0037
paulplotsker@gmail.com
*Co-Counsel for Plaintiff-Appellant*
*Melanie Pelcha*

Respectfully submitted,

*/s/*Morris E. Fischer_____
Morris E. Fischer, Esq.
(DC No. 490369)
8720 Georgia Avenue, Suite 210
Silver Springs, MD, 20910
Tel. No. 301-328-7631
morris@mfischerlaw.com
*Co-Counsel for Plaintiff-Appellant*
*Melanie Pelcha*

## <u>CERTIFICATE OF COMPLIANCE</u>

Certificate of Compliance With Type-Volume Limitation,
Typeface Requirements, and Type Style Requirements

1. This brief complies with the type-volume limitation of Fed. R. App. P.

32(a)(7)(B) because:

this brief contains <u>12,206</u> words, excluding the parts of the brief

exempted by Fed. R. App. P. 32(f) and 6 Cir. R. 32(b).

2. This brief complies with the typeface requirements of Fed. R. App.

P.32(a)(5) and the type style requirements of

Fed. R. App. P. 32(a)(6) because: this brief has been prepared in a

proportionally spaced typeface using

Microsoft Word in 14-point Times New Roman font.

Dated: August 7, 2020              /s/ Donald B. Hordes
                                   *Counsel for Appellant*

## <u>CERTIFICATE OF FILING AND SERVICE</u>

I hereby certify that on this 7th day of August 2020, I caused this Brief of

Appellant to be filed electronically with the Clerk of the Court using the CM/ECF

System, which will send notice of such filing to the following registered CM/ECF

users:

>Robin D. Miller
>ULMER & BEME
>600 Vine Street, Suite 2800
>Cincinnati, Ohio  45237
>(513) 698-5108
>
>*Counsel for Appellees*

Dated: August 7, 2020                    /s/ Donald B. Hordes
                                               *Counsel for Appellant*

## PLAINTIFF-APPELLANT'S DESIGNATION
## OF RELEVANT DISTRICT COURT DOCUMENTS

Plaintiff-Appellant, pursuant to Sixth Circuit Rule 28(d) hereby designates the following filings in the District's record as items to be included in the Appendix.

| Record Entry No. | Description of Entry | Page ID # or Documents Page # |
|---|---|---|
| RE 62 | Notice of Appeal | 1258 |
| RE 60 | Opinion and Order of District Court | 1208-1256 |
| RE 50 | Memo Contra Def's MSJ | 832-986 |
| RE 54-2 | Excerpts from the Deposition of Rebecca Firestone filed with Defendant's Watch Hill Bank's Reply Memorandum in support of its Motion for Summary Judgment | 1144 |
| RE 50-2 | Excerpts from Transcript of Gregory Niesen Deposition | 865-880 |
| RE 50-3 | Excerpts from Schneider deposition | 894-919 |
| RE 50-4 | Excerpts from the Deposition of Rebecca Firestone | 898 |
| RE 50-5 | Excerpts from Transcript of Brenda Sonderman Deposition | 903-972 |
| RE 50-8 | Exhibit 31 filed with Plaintiff-Appellant's Memo Contra | 930-986 |
| RE 50-6 | Excerpts of Transcript of Deposition of Lindsey Crothers | 926-927 |
|  |  |  |
|  |  |  |
|  |  |  |
|  |  |  |
|  |  |  |
|  |  |  |
|  |  |  |
|  |  |  |

# ATTACHMENT A

Case: 20-3511    Document: 19    Filed: 08/07/2020    Page: 69

# RITTER & RANDOLPH, LLC
### ATTORNEYS AT LAW

Daniel P. Randolph *1
Mary Ann Jacobs
Marc A. Randolph *3
Donald B. Hordes *5
Joseph Zoimen *4
Justin T. Precht *1
Erica L. Groman
Thomas M. Drinan

Suite 700
1 East Fourth Street
Cincinnati, Ohio 45202-3705

telephone 513-381-5700
direct 513-744-7735
facsimile 513-381-0014

John H. Ritter (1917-1993)
Georgana Taggart *1 *2
of counsel
John T. Schwierling, inactive

*1 also admitted in Kentucky
*2 also admitted in Indiana
*3 also admitted in Virginia
*4 also admitted in New York
*5 also admitted in District of Columbia
www.ritterandrandolph.com
dhordes@ritter-randolph.com

February 4, 2020

Judge Douglas R. Cole
Potter Stewart U.S. Courthouse, Room 810
100 East Fifth Street
Cincinnati, Ohio

Re: **Pelcha v. MW Bancorp, Inc., et al.**
      **Case No. 1:17-cv-00497**

Dear Judge Cole:

What follows is a list of both Federal and Ohio court decisions which hold that "direct evidence" of employment discrimination on the basis of age includes statements by decision-makers that reflect their discriminatory attitude towards older employees *in general* as well as statement directed to or about the plaintiff employee *in particular*.

## Federal Cases

1. *LaPointe v. United Autoworkers Local 600,* 8 F.3d 376, 379-381 (6th Cir. 1993)

2. *Cooley v. Carmike Cinemas, Inc.,* 25 F.3d 1325, 1330-1331,1333 (6th Cir. 1994)

3. *Conti v. American Axle and Mfg. Co.,* 326 Fed Appx 900, 910 (6th Cir.2009). also cited as Case No. 08-1301, Slip Opinion at 18-19.

4. *Lai Ming Chu v. Donahoe,* 580 Fed. Appx 430,437 (6th Cir. 2014). Also cited as Case No. 14-1105, Slip Opinion at 11-12.

5. *King v. Hardesty,* 517 F. 3d 1049, 1057-1059 (8th Cir. 2008).

Case: 20-3511    Document: 19    Filed: 08/07/2020    Page: 70

6. *Van Voorhis v. Hillsborough County Board of County Commissioners*, 512 F. 3d 1296, 1300 (11th Cir. 2008).

7. *Best v. Blount Memorial Hospital*, 195 F. Supp. 2d 1034, 1041 (E.D. Tenn. 2001)

**Ohio Cases**

*Mauzy v. Kelly Services, Inc.* ,75 Ohio St. 3d. 578, 586-590 (1996)

Sincerely,

RITTER & RANDOLPH, LLC

Donald B. Hordes

DBH:lc